# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| JESSICA WHITFIELD, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 3:08-1010 |
| v. ) | Judge Echols |
| ) | |
| STATE OF TENNESSEE, et al., ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Defendants State of Tennessee Department of Mental Health and Developmental Disabilities ("TDMHDD"), and TDMHDD Commissioner Virginia Trotter Betts filed Defendants' Motion For Summary Judgment (Docket Entry No. 23), to which Plaintiff Jessica Whitfield filed a response in opposition (Docket Entry No. 31) and Defendants filed a reply (Docket Entry No. 33).

Plaintiff is a thirty-three year old former administrative secretary for TDMHDD, whose employment was terminated in February 2008. After exhausting administrative remedies, Plaintiff filed her initial Complaint on October 14, 2008, alleging disability discrimination under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12112(5)(A) & (B), 12131, & 12132. She filed an Amended Complaint on December 30, 2008. Plaintiff sought general and specific damages of $50,000, which included back wages in the minimum amount of $16,936; reinstatement with the State of Tennessee in a like position with comparable pay; compensatory and punitive damages in the amount of $450,000; and attorney's fees, costs, and pre- and post-judgment interest. In a prior Order entered on January 6, 2009 (Docket Entry No. 19), the Court granted Defendants' motion to dismiss Plaintiff's request for money damages under Title I of the ADA, pursuant to Board of

1

Trustees v. Garrett, 531 U.S. 356 (2001) (holding Congress did not abrogate states' Eleventh Amendment immunity from suits for money damages when it adopted Title I of ADA).

## I. FACTS

Plaintiff has eye problems requiring a prosthesis, cerebral palsy in her hands, and mobility issues. She obtained a high school education. Plaintiff began her employment with the State of Tennessee in 1998 as a telephone operator I with the Department of Finance and Administration ("TDFA"). Plaintiff answered telephone calls, looked up information in a computer to supply to callers, connected callers to other state employees and offices, sent out form letters and emails, and helped update the directory assistance system. She also helped keep the State of Tennessee's telephone directory up to date. Plaintiff was eventually promoted to telephone operator II, and some of her duties in this job included training other operators, keeping up with time and attendance for telephone operator I's, and drafting business letters. These positions did not require Plaintiff to file paperwork. In the last eighteen months Plaintiff worked for TDFA, she conducted email correspondence with others on a daily basis for at least half of her shift. Plaintiff earned good to superior evaluation ratings at TDFA. She used a large computer monitor and a special computer keyboard TDFA supplied to her because of her vision problems and her cerebral palsy. (Docket Entry No. 30-1, Whitfield Depo. at 12-15, 21-23, 81.)

While employed at TDFA, Plaintiff applied for several different state positions, but she was not offered a new position until September 4, 2007 when she began working for TDMHDD as an administrative secretary. Plaintiff carried more responsibility in the administrative secretary position than she did as a telephone operator at TDFA. Pursuant to state policy, Plaintiff began a new six-month probationary period. Plaintiff admitted she was still in the probationary period when her

2

employment was terminated and that TDMHDD could terminate her employment for just about any reason other than her disability during that period of time. Plaintiff did not receive an interim evaluation during her probationary period at TDMHDD, but she was not aware of any rule or requirement that she be given such an evaluation. Plaintiff felt such an evaluation would have helped because she would have taken a grammar class offered by the State and, if her employment was going to be terminated at TDMHDD, she could have gotten on the state job register sooner. (Id. at 28, 33-37, 40-45, 60-61; Docket Entry Nos. 30-4, Ex. 6, 30-5, Ex. 7; Docket Entry No. 30-2, Whitfield Depo. at 172, 190-191.)

Plaintiff's direct supervisor at TDMHDD was Ann Turner Brooks. Plaintiff acknowledged that, when she started her new position, she may have seen a "Plan of Action" that Brooks wrote for her, but Plaintiff did not remember receiving a copy of it. Plaintiff testified her duties in the administrative secretary position at TDMHDD were to answer the phones, direct phone calls to individuals, make file folders for the agencies serviced by the office, make copies and file agency licensing applications and other documents in filing cabinets, input information from complaint forms received by the office into the computer and then file the complaint forms, prepare mailings for licensing renewal applications, and handle documents for fire marshal inspections of agencies. She also agreed that the plan of action accurately listed the duties she was expected to perform, except for typing licenses. Plaintiff spoke to Brooks before she started the position and told her she was a left-handed keyboardist, she typed with only one hand, and she was not very fast at typing. Brooks promised that day that the other secretary in the office would do "a good part" of the typing. Plaintiff had done data entry in her former position, and she was used to typing in "little things, but not like paragraphs."  (Docket Entry No. 30-1, Whitfield Depo. at 45-46, 65.)

3

Plaintiff felt she ended up doing a significant amount of typing, especially to input data into the computer from complaint forms. The complaints concerned licensed agencies or facilities and the complaints could involve safety, environmental, or service issues. The complaints originated from a variety of sources, including service recipients and families. Plaintiff had difficulty figuring out how to input complaints into the computer, and the box on the computer screen in which she was supposed to write one or two paragraphs describing the nature of the complaint was small and hard for her to see. The computer application for the complaints did not have a spell check feature Plaintiff could use, but spell check was added to the application the day Plaintiff's employment was terminated. Plaintiff had access to Microsoft Word on her computer, which had a spell check feature, but she did not know if she could type the paragraphs describing the complaint in Microsoft Word and then cut and paste them into the small box in the complaint software. To save time Plaintiff scanned the original complaint form, then cut and pasted the last paragraph describing the nature of the complaint into the computer program. Although Plaintiff's supervisors later told her that she failed, among other things, to correct spelling errors in the complaint descriptions, Plaintiff testified she did not look them over or check "everybody else's spelling." She pasted in the complaint descriptions because "that's what she told me to do." Nonetheless, Plaintiff's supervisors informed her she was responsible for the spelling in the computerized complaint forms. (Docket Entry No. 30-1, Whitfield Depo. at 34-35, 45-48, 50-51, 65; Docket Entry No. 30-6, Ex. 8; Docket Entry No. 30-13, Headrick Depo. at 33.)

Paper documents were supposed to be kept in file folders in alphabetical order and the file cabinets were marked with letters on the outside to indicate which file folders could be found in the drawers. However, the files were unorganized and the cabinets themselves were not sitting in

4

alphabetical order. Also, when files became too large, Brooks would place the large files someplace else making the files more difficult to find. Some agencies changed their names, but the file folders for those agencies were not always changed to reflect the new names. When Plaintiff could not find a file, she asked one of the surveyors in the office to help her, and if the file still could not be found, she asked Brooks for assistance, and even Brooks sometimes had difficulty finding files. When Plaintiff first started as administrative secretary, Brooks quickly showed Plaintiff the filing cabinets and their layout, as well as the color-coding used in the file folders, all of which was confusing to Plaintiff. She depended on co-workers to help her find files. Plaintiff was allowed to spend the first two weeks of her employment getting acquainted with the filing system. Plaintiff could recall only one or two times when Brooks told her she filed documents in the wrong place in the filing cabinets. Upon learning this, Plaintiff tried to correct her errors. She did not feel she was given less filing to do over time because she was constantly busy. Plaintiff felt she was pretty familiar with the filing system and she could find files on her own by the time her employment terminated six months later. (Docket Entry No. 30-1, Whitfield Depo. at 56-60; Docket Entry No. 30-2, Whitfield Depo. at 171-172.)

Brooks and other administrators at TDMHDD knew Plaintiff needed her special keyboard, so arrangements were made for it to be transferred from TDFA. Brooks sent a memo to Phaedra Black on August 13, 2007, before Plaintiff started work at TDMHDD, stating:

> Please be reminded that Jessica Whitfield is a disabled applicant. And has provided the following disabilities for our review & assistance:
>
> Visual Problem
> Left handed & needs a left hand-key board
> Mild CP on right side
> Need 19 inch Computer Screen[.]

5

(Docket Entry No. 30-10, Ex. 15.) TDMHDD provided Plaintiff with a large screen computer monitor, but because of its size and placement in the corner of Plaintiff's L-shaped cubicle, Plaintiff could not move the monitor around to get it close enough to her to see. She could not pull her chair up directly in front of the monitor and her keyboard was to the side. Due to her vision problems Plaintiff must have something directly in front of her to be able to see it very well and not hurt her neck. A co-worker moved the monitor a little bit, but it was not enough to help. Shortly after Plaintiff started her new job, all of the workers in her office received new computers and flat screen monitors. At TDFA, Plaintiff had used a flat screen monitor with her special keyboard. However, the information technology staff at TDMHDD told Plaintiff that her special keyboard would not plug into a new flat screen monitor, and Plaintiff contends they did not try to find a way to make the two pieces of equipment compatible, even though she knew from her prior job that it could be done. As a result, Plaintiff was required to use the bigger, less mobile monitor without being able to sit directly in front of it. Even though Plaintiff did not request it, TDMHDD provided Plaintiff with a computer printer and scanner so she would not have to walk to a remote printer to pick up copies and faxes or scan documents. Most of the other employees shared a printer/scanner. Brooks wrote an email to Tracey Robinson-Coffee, the former director of the office, on September 6, 2007, stating in part: "Please be aware that Jessica Whitfield has a physical disability relating to walking, transporting documents, and standing for short periods of time. **Therefore, she will need a printer to assist with typing of the 702 Middle TN facilities, making copies of licenses and other documents, as well as a scanner to help with forwarding licensure materials.**" Brooks listed herself as the other person in the office with a mobility problem because she was suffering from cancer at the time. (Docket Entry No. 30-1, Whitfield Depo. at 50, 65-68, 75, 79-81, 86-87; Docket

6

Entry No. 30-11, Ex. 16 (emphasis in original); Docket Entry No. 30-2, Whitfield Depo. at 118-119, 159; Docket Entry No. 30-18, Brooks Depo. at 51.)

In late January 2008, Plaintiff spoke to Brooks and requested an evaluation of her workspace by the Tennessee Technological Access Program ("TTAP"), to include an ergonomic assessment of her equipment and/or computer related devices, monitor, keyboard and phone, in order to find out what she needed to do her job. Plaintiff thought a flat screen monitor, a vision program for her computer, a different mouse or mouse pad, or different positioning might help her. Brooks instructed her to write a letter for her signature to send to TTAP. Plaintiff drafted the letter dated January 30, 2008, for Brooks' signature, at home on a weekend and sent it to Brooks (Docket Entry No. 31-3, Ex. 12; Docket Entry No. 32-4, Ex. 25), but Brooks had no recollection of ever receiving the draft letter from Plaintiff. (Docket Entry No. 30-18, Brooks Depo. at 23-24.) The evaluation was not provided, but Plaintiff admitted it was possible that the decision to terminate her employment was made before she requested the evaluation. (Docket Entry No. 30-1, Whitfield Depo. at 74-75, 79; Docket Entry No. 30-2, Whitfield Depo. at 177; Docket Entry No. 31-2, Whitfield Depo. at 182; Docket Entry No. 32-1, Whitfield Depo. at 72.)

Plaintiff admits that she made spelling and grammatical errors in typing descriptions of the complaints received. Gina Young is an IT person who built the computer program for complaints. Cynthia Headrick, in the Eastern Division, took the lead in overseeing implementation of the computer program for complaints statewide. Plaintiff admits that Young, Headrick, and Brooks instructed her to correct mistakes and that she should describe the complaints received in complete sentences. In an email responding to Headrick, Plaintiff stated: "sorry about my Grammar and English never have done complete sentences very well Thanks[.]" Plaintiff also spoke to Headrick

7

and asked if spell check would help her a little bit. Headrick responded, "Yes, of course it would help you. It would help you with some of it, yes." (Docket Entry No. 32-1, Whitfield Depo. at 111.) Plaintiff was aware that the new director, Amber Gallina, presented Brooks with several pages of errors in complaints that Plaintiff had handled, and Brooks then called Plaintiff into her office, showed her the errors, and told her she needed to correct the errors. On the forms prepared to request fire marshal inspections, Plaintiff entered the wrong county or no county at all. Plaintiff made errors on mailing labels and testified "I just wasn't looking that close, you know." Plaintiff also disputes, however, whether she prepared the labels included in Defendants' examples and whether the envelopes containing the incorrect labels were sent out while she was still employed or after her employment was terminated. (Docket Entry No. 30-1, Whitfield Depo. at 89-90, 98-99; Docket Entry No. 30-12, Exs. 17-20, 22; Docket Entry No. 30-2, Whitfield Depo. at 100-104, 113, 230.)

Plaintiff admits that TDMHDD made some accommodations for her, but she alleges that her employment was terminated because TDMHDD did not want to make enough accommodations for her. The accommodations Plaintiff believed she did not receive were a flat screen computer monitor that would work with her special keyboard, a job coach, and a workplace evaluation. Plaintiff did not contact anyone in TDMHDD about a job coach. Plaintiff alleges that if she had had the accommodations, her spelling and typing would have been better. (Docket Entry No. 30-1, Whitfield Depo. at 80, 87; Docket Entry No. 30-2, Whitfield Depo. at 174; Docket Entry No. 31-1, Whitfield Depo. at 110, 147, 173.)

Ann Brooks, who is now retired, held the title of Mental Health Specialist 3 when she was Plaintiff's supervisor. She was the coordinator for the Middle Region of TDMHDD. Brooks made

8

the decision to hire the Plaintiff, who was responsible for the secretarial work of four surveyors. Brooks knew that Plaintiff had a disability when she hired her, and Brooks asked her superiors to approve the accommodations that Plaintiff requested when she was hired. The accommodations were approved. Brooks provided Plaintiff with a list of her duties and described what she needed to do in order to function in the department. Brooks and the other surveyors showed Plaintiff how to do the filing. Brooks gave Plaintiff a list of agencies that needed file folders and showed Plaintiff how to make new file folders for those agencies. Brooks also gave Plaintiff a "Revised File Checklist," which contained the items that go into a licensure file, and she also gave Plaintiff a list of facilities and their addresses for the purpose of fire marshal inspections and reports. She gave Plaintiff permission to take any training courses offered by the State, such as for spelling, grammar, and punctuation, that Plaintiff wanted to take. Brooks did not give Plaintiff a written evaluation, but she did talk to Plaintiff about her poor spelling and grammar. After Plaintiff had done the filing, Brooks checked the files. She talked to Plaintiff about the need to file documents accurately and to type accurately the information that was put into the files and reports. When Brooks found mistakes on complaints, reports, and file folder information, she instructed Plaintiff about what she did wrong and gave the papers back to her to correct. (Docket Entry No. 30-18, Brooks Depo. at 7, 10-17, 19, 22, 37-38, 46; Docket Entry No. 27, Brooks Aff. ¶¶4-8.)

Brooks made the decision to terminate Plaintiff's employment because Brooks had to do the work that Plaintiff was hired to do. Plaintiff did not do well in filing and typing because of her poor spelling and grammar, although Brooks knew that Plaintiff had spell-check available on her computer. One of the staff members complained to Brooks about Plaintiff's mis-filing and spelling. Brooks also had a conversation with Amber Gallina, her own supervisor, about Plaintiff's filing.

According to Brooks, the files were in disarray and, although there were some problems with the location of the files before Plaintiff was hired, the organization of the file folders themselves got worse after Plaintiff was hired. As a result of Plaintiff's inaccuracy, Brooks and the other surveyors handled the filing, Brooks entered all of the financial information into the computer, and Brooks started doing some of the complaints. Brooks told Plaintiff that she was assigning Plaintiff's work to other staff members. She did not end Plaintiff's employment sooner because she tried to give her a chance to do better. (Id. at 18-19, 21, 27-28,48; Docket Entry No. 30-16, Clinton Depo.; Docket Entry No. 30-17, Duncan Depo.)

Cynthia Headrick is the coordinator for the East Tennessee licensure division within TDMHDD, Ann Brooks' counterpart. When the computer program was designed for the complaint system, Headrick was named the point person within the State of Tennessee to work with the IT staff and to answer questions asked by users of the system. Part of her responsibility involved instructing Ann Brooks and Plaintiff in the Middle Tennessee licensure division about how to use the computer program. At the request of her supervisor, Amber Gallina, Headrick reviewed the complaints that were put into the system because Gallina knew of errors in the complaints entered in the Middle Region. Headrick reviewed complaints with Gina Young in IT and noticed that many were full of errors. Headrick testified that Plaintiff entered complaint information without capitalization, punctuation and complete sentences. She also used poor spelling and grammar. Plaintiff told Headrick that she struggled in all of these areas. On at least one occasion, Headrick told Plaintiff in an email that she needed to enter the information into the system completely and correctly because the printed complaints could end up in the commissioner's office, the governor's office, or on the front page of the newspaper. Headrick counted seventeen employees, not all of whom were

10

administrative secretaries, who did the same type of work as Plaintiff did by entering information into the computerized complaint system, but Headrick was not aware of any other employees who had problems with spelling or punctuation. Headrick testified that Plaintiff had spell-check on her computer; however, spell-check was available in only certain fields of the complaint program. On January 31, 2008, Headrick had a conversation with Plaintiff about the spell-check function. Headrick then requested that IT staff add spell-check to the field in the complaint program dedicated to describing the complaint. (Docket Entry No. 30-13, Headrick Depo. at 6, 9-10, 13, 23, 27, 30; Docket Entry No. 29, Headrick Aff.)

Gina Young manages the programming unit in the IT department. She developed the new computer program used in the licensure division starting in September or October 2007. The program tracks the licenses for mental health and mental retardation facilities, produces license certificates that are mailed to facilities, produces invoices, and tracks fees and complaints. It was designed so that an administrative assistant could take a complaint by telephone and input minimal information to get the complaint into the system for referral to an investigator for follow-up. In the fall of 2007, Young provided group training in a classroom setting for all of the staff who use the program, and Plaintiff attended the training. After the training, if the Plaintiff had questions about using the program, she was to first direct her question to Brooks, and if she could not answer the question, Brooks would contact Cynthia Headrick, and if the question still could not be answered or Headrick was unavailable, Brooks contacted Young. After the new program went live, Young monitored the data to be sure people using the program understood what they were doing. She noted that Plaintiff had some problems following the protocol for entering multiple complaints against the same facility, but Plaintiff was not the only person who made that error. Young also noted that

11

complaint descriptions Plaintiff put into the system had spelling errors and incomplete sentences. The investigation report section of the program had a spell-check feature, but the complaint description field did not have spell-check at the time Plaintiff used it. Young added spell-check to the description field on February 26, 2008, at the request of Headrick, who made the request on February 1, 2008. The program did not have any grammar checks. Young pointed out Plaintiff's errors to the supervisors. Young did not recall that any other employees had similar problems. (Docket Entry No. 30-15, Young Depo. at 5-7, 9-11, 14-17; Docket Entry No. 25, Young Aff.)

Amber Gallina took the position of Director of Licensing in November 2007, after Plaintiff started as an administrative secretary in the division in September 2007. Gallina supervised the coordinators in the three grand divisions of the state, including Ann Brooks in the Middle Region, Plaintiff's supervisor. Gallina had very minimal interaction with Plaintiff, but she had conversations with Brooks about Plaintiff. Gallina spoke to Brooks about concerns raised by Headrick and Young about the IT system. Young forwarded Plaintiff's errors on the complaints to Gallina, and she reviewed them. Brooks also raised concerns to Gallina about the Plaintiff's work performance, particularly her filing and typing errors on complaints and fire marshal inspection documents. Gallina did not have any information that Plaintiff requested accommodations during her employment, except that on one occasion Plaintiff told Gallina she had asked Brooks for a wider computer screen. After Plaintiff was terminated, Gallina saw an email about accommodations for Plaintiff that should have gone through Gallina, but it did not. Had Gallina known of the request, she would have referred it to her supervisor and to human resources. When Brooks stated she wanted to terminate Plaintiff's employment in the probationary period in February 2008, Gallina discussed the issue with her supervisor, Cynthia Tyler, and the staff in human resources. Gallina

12

Case 3:08-cv-01010 Document 40 Filed 11/16/09 Page 12 of 20 PageID #: 604

understood from Brooks that Plaintiff did not file documents accurately, she had an overall inability to manage the workload that needed to be managed in the office, and Brooks was picking up or reassigning to other staff tasks that Plaintiff was supposed to do. (Docket Entry No. 30-14, Gallina Depo. at 11, 16, 19-20, 24, 39-40, 44-45.)

Heather Gundersen is the Information Technology Director for TDMHDD. After checking IT records, Gundersen did not find any indication that Plaintiff contacted anyone within the IT department asking about a computer monitor. Due to a limited budget, the agency replaces as many office computers as possible on a four to five-year replacement cycle. Many people, including Gundersen, are still using older computers with older monitors. Plaintiff's computer was slated for replacement in 2007, and the replacement computers came with 17-inch flat screen monitors. The older monitors are 19 inches. It was determined that Plaintiff's specialized keyboard would not operate with the new computer. The keyboard had an adapter that was not compatible with the new computer. There was no way to plug the keyboard into the computer. Changing the drivers on the keyboard would not have allowed it to work on the computer because there was no way to plug it into the computer. Therefore, the IT department left in place Plaintiff's existing computer with the 19-inch monitor. Plaintiff did not receive a flat screen monitor because such monitors were paired with the new computers. Gundersen did not receive a letter from anyone requesting an evaluation from the Tennessee Technological Access Program for Plaintiff; in fact, Gundersen does not know what that program is. (Docket Entry No. 28, Gundersen Aff.)

Defendant Trotter sent a letter to Plaintiff dated February 7, 2008, terminating her employment during the probationary period and setting the effective date of termination as February 22, 2008. (Docket Entry No. 30-8, Ex. 13.) Defendant Trotter subsequently sent another

13

letter to Plaintiff dated February 19, 2008, extending the effective date of termination to February 27, 2008. (Docket Entry No. 30-9, Ex. 14.)

## II. **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

14

## III. ANALYSIS

Although neither party raises the issue, the Court first notes that the ADA Amendments Act of 2008, which became effective on January 1, 2009, Pub.L. No. 110-325, § 8, 122 Stat. 3553, does not apply retroactively to govern the conduct in this case, all of which occurred before the Act became effective. Milholland v. Sumner County Bd. of Educ., 569 F.3d 561, 565-567 (6th Cir. 2009). Having determined that prior ADA law applies, the Court turns to Defendants' arguments that Plaintiff has not established a *prima facie* case of disability discrimination under Title I of the ADA, and even if she has, Defendants produced a legitimate, non-discriminatory reason for terminating Plaintiff's employment and Plaintiff has not shown that the reason was a pretext for disability discrimination.

The ADA provides in relevant part that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Where, as in this case, the Plaintiff seeks to establish discrimination through indirect evidence, the Plaintiff must first establish a *prima facie* case under the analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). See Talley v. Family Dollar Stores, 542 F.3d 1099, 1105 (6th Cir. 2009). "To establish a prima facie case of discrimination under the ADA, a plaintiff must show '(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability.'" Id. (quoted case omitted). The third element requires that the Plaintiff suffer an adverse employment action. Id.

15

The parties do not dispute that Plaintiff is disabled for purposes of the ADA.  See Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 900 (8th Cir. 2006) (holding visual impairment is a disability within the meaning of the ADA because it substantially limits major life activity of seeing).  Nor do the parties dispute that Plaintiff suffered an adverse employment action when her employment was terminated.  At issue is whether Plaintiff was otherwise qualified to perform the duties of the administrative secretary position, with or without reasonable accommodation, and whether Plaintiff was discriminated against solely because of her disability.

A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . . [C]onsideration shall be given to the employer's judgment as to what functions of a job are essential[.]" 42 U.S.C. § 12111(8).  "[T]he disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable."  Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1183 (6th Cir. 1996).  The desired accommodation must be efficacious and proportional to cost.  Id.  The employer then bears the burden of persuasion on whether an accommodation would impose an undue hardship.  Id.

Plaintiff's supervisor, Ann Brooks, was well aware that Plaintiff had disabilities at the time she offered Plaintiff the administrative secretary position.  Plaintiff asked for a large screen monitor and the specialized keyboard she used in her prior position at TDFA.  Brooks followed through on the requests and made sure that Plaintiff had both a large screen monitor and her special keyboard when she started work at TDMHDD in September 2007.  Brooks also obtained a printer/scanner for Plaintiff so she would not have to walk to reach a printer/scanner shared with other employees.

Despite receiving these accommodations, Plaintiff claims that her employer did not do

16

enough to help her. Plaintiff complained that her 19-inch computer monitor sat in an awkward position and it was too big to draw it close to her so she could see. Taking as true that Plaintiff asked her supervisor and the IT staff to provide her with a flat, large-screen monitor and computer that was compatible with her special keyboard and that Plaintiff sought an ergonomic evaluation of her work space, it seems possible, if not probable, that Plaintiff's typing might have improved to some extent, as Plaintiff testified, because she would have been better able to see what she typed. Defendants produced no evidence that these accommodations would have imposed an undue hardship to TDMHDD. Headrick requested installation of spell-check in the description field of the complaint program, but the IT staff installed the spell-check function in that description field too late to help Plaintiff because her employment had already been terminated.

Even if TDMHDD had made the additional accommodations Plaintiff requested, however, Plaintiff nonetheless conceded that she knew she had problems with grammar, punctuation, and writing in complete sentences, even at her prior job at TDFA. Plaintiff also knew that the State offered grammar classes, but she did not sign up for such a class. Plaintiff knew that spell-check and grammar check existed on her computer to be used in the word processing application, but having such tools available for all secretarial functions except inputting complaints did not prevent Plaintiff from making a variety of mistakes in her typing of documents, reports, file folders and labels, even after Brooks instructed her to be more accurate in her work.

Another essential function of Plaintiff's job was filing documents and file folders in filing cabinets. Plaintiff did not file documents in her prior job as a telephone operator I or II at TDFA. Plaintiff received on-the-job training from Brooks and the other surveyors in the office about how to file documents in her new job. Plaintiff did not ask Brooks for any reasonable accommodation

17

to assist her in more accurately filing documents. At her deposition, Plaintiff stated she thought a job coach might have helped her do her job, but she conceded that she did not ask her supervisor or anyone else to supply a job coach.

Thus, the Court concludes that a close question is presented whether Plaintiff has shown that she was qualified to perform her administrative secretary job with or without reasonable accommodation. Because facts and inferences should be drawn in Plaintiff's favor on motion for summary judgment, the Court will give the Plaintiff the benefit of the doubt that she has met the second element of the *prima facie* case. In her former position as a telephone operator II, Plaintiff supervised the telephone operator I's and drafted business letters. Brooks hired Plaintiff into the administrative secretary position knowing that she had disabilities, and based on Plaintiff's prior job experience with the State, Brooks herself must have believed that Plaintiff was qualified to assume the position or she would not have hired her.

Defendants also argue that Plaintiff cannot establish the third element of the *prima facie* case because she cannot show she suffered an adverse employment action *solely* because of her disability. This argument overlaps with Defendants' previous argument and dovetails into Defendants' proffered legitimate, non-discriminatory reason for terminating Plaintiff's employment, as well as whether Plaintiff has shown that the Defendants' stated reason was a pretext for disability discrimination. Accordingly, the Court turns to those arguments.

The vast majority of circuit courts which have addressed the issue have "held that an employee may recover under the ADA if the employee's disability was a 'motivating factor' in the employer's decision, and that the employee need not establish that he or she was fired 'solely' because of his or her disability." Macy v. Hopkins County School Bd. of Educ., 484 F.3d 357, 364

18

n.2 (6th Cir. 2007)(collecting cases). However, borrowing language from the Rehabilitation Act, the Sixth Circuit has repeatedly held that in order to recover under the ADA, a plaintiff must show that she was discharged solely by reason of her disability. Id.

Defendants contend that they terminated Plaintiff's employment during the probationary period because of her poor work performance and Defendants deny that disability discrimination played any part in the decision. The burden then falls on the Plaintiff to show that Defendants' given reason is a pretext for discrimination. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

That Plaintiff was fired because of her poor job performance does not establish discrimination on the basis of her disabilities. Maddox v. University of Tennessee, 62 F.3d 843, 845 (6th Cir. 1995). Neither does the supervisors' awareness of Plaintiff's disabilities rise to the level of evidence of intentional discrimination. Although Plaintiff has shown that Brooks knew about her disabilities, this is not enough, standing alone, to establish that awareness of the disabilities was the basis for firing, especially when Brooks was the supervisor who hired Plaintiff in the first place. See Brohm v. JH Properties, Inc., 149 F.3d 517, 522 (6th Cir. 1998) ("evidence that an employer knows that an employee has a disability is not enough to establish that this knowledge was the basis for the termination."); Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 573-574 (6th Cir. 2003) (discussing "same-actor inference"); Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463-464 (6th Cir. 1995) (same).

19

Other than the evidence already discussed as relating to Plaintiff's *prima facie* case, Plaintiff has not produced sufficient other evidence to show that Defendants' reason for terminating her employment had no basis in fact, that it did not actually motivate the Defendants' challenged conduct, or that it was insufficient to warrant the challenged conduct. The amount of evidence Plaintiff must produce to establish her *prima facie* case "is not the same amount necessary to win a judgment." EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997). The *prima facie* case establishes only a rebuttable presumption of discrimination. Id. To win judgment, Plaintiff "is required to overcome the additional obstacle of the defendant's rebuttal and convincingly demonstrate the existence of discrimination." Id. Plaintiff must present a case that allows the inferences drawn in her favor at the *prima facie* stage "to be of significant force as to overcome the defendant's rebuttal or prove the rebuttal pretext." Id. In short, Plaintiff has not created a genuine issue of material fact that her employment was terminated *solely* because of disability discrimination against her. Therefore, Defendants are entitled to summary judgment.

In light of the Court's conclusion on the merits of Plaintiff's ADA claim, the Court need not reach the issue whether Plaintiff would be entitled to recover damages under Title II of the ADA.

## IV. CONCLUSION

For all of the reasons stated, Defendants' Motion For Summary Judgment (Docket Entry No. 23) will be granted and this case will be dismissed with prejudice.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

20

Case 3:08-cv-01010 Document 40 Filed 11/16/09 Page 20 of 20 PageID #: 612